IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>ARTHUR ROWLAND | CRIMINAL ACTION<br>NO. 18-00579-2 |

**PAPPERT, J.**                                                                                     February 15, 2019

## MEMORANDUM

On December 12, 2018 Arthur Rowland was charged by indictment with conspiracy to distribute 500 grams or more of a substance containing methamphetamine and marijuana in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A). (ECF No. 1.)[1] Rowland was arrested two days later in Unit 14Q of the Park Plaza Condominiums at 3900 Ford Road in Philadelphia. At Rowland's bail hearing on December 19, 2018 Magistrate Judge Hart ordered that Rowland be detained pending trial, finding that no condition or combination of conditions could assure the safety of the community and Rowland's appearance at trial.

Rowland filed a motion for revocation of the detention order and request for expedited hearing. (ECF No. 72.) Pretrial Services submitted an updated report, recommending that Rowland remain detained pending trial. (Mem. Pretrial Services at 2.) The Court held a hearing on February 11, 2019 and for the reasons that follow denies the Motion.

---

[1] The grand jury returned a superseding indictment on January 9, 2019, which added Jeffrey Stamps to the conspiracy but did not affect the charges against Rowland. *See* (ECF No. 43).

I

Special Agent Elizabeth Brewer, a member of the FBI's Violent Crime and Narcotics Task Force and one of the agents assigned to the investigation, testified at the hearing. Special Agent Brewer, whose testimony the Court found credible, described the search of Unit 14Q incident to Mr. Rowland's arrest. Upon entering the condo, FBI agents found Rowland and a Philadelphia County Sheriff's Deputy named Stacei Woods in the master bedroom area. (Hr'g Tr. 65:5–9, 73:8–10.) The agents also found, among other things:

- Approximately 3 pounds of suspected methamphetamine in the bottom drawer of the oven in the unit's kitchen, (*id*. at 66:18–67:22; Government Ex. 7);

- A Sig Sauer .40 caliber handgun in a backpack near the front door to the unit. There were 9 rounds of ammunition in the gun's magazine and a bullet in the chamber, (*id*. at 68:3–14; Government Ex. 8);

- A drum magazine with 73 76.2 caliber rounds of ammunition, consistent with what is used in an AK-47 assault rifle, (Hr'g Tr. 68:20–69:19; Government Ex. 9);

- $10,000 in United States currency stuffed into the frame of the living room couch and another $6,900 in cash in the pocket of a pair of jogging pants. A wallet containing Mr. Rowland's driver's license and numerous credit cards in his name were found with some of the cash. (Hr'g Tr. 70:2–8; Government Ex. 10A, 10B, 12A and 12B.)

The FBI learned later that day that there were assault rifles hidden in a television stand in the spare bedroom. (Hr'g Tr. 82:15–18.) Agents returned for the TV stand, and when they arrived, found people removing clothing and furniture from the condo. *See* (*id*. at 72:3–6). One of those people was Tonine Rowland, the Defendant's sister. (*Id*. at 73:15–25.) Ms. Rowland also testified at the hearing and the Court found her testimony to be preposterous; the antithesis of reliable. Mr. Rowland's counsel set

the stage for Ms. Rowland's performance by asserting that the unit had been left unsecured after the initial search and that there was a "high risk of burglary" in that "particular neighborhood."² (*Id*. at 5:11–14.) Given that apparent danger to property, Ms. Rowland said that she went to the unit to retrieve her driver's license and some of her clothes. (*Id*. at 13:11–13.) She then acknowledged that the TV stand which the agents were looking for was "found in her car," though she purportedly did not know how it got there. (*Id*. at 14:13–16:4.) For his part counsel also felt that "someone else took the stand and put it in her car." (*Id*. at 9:6.)

According to Special Agent Brewer, Ms. Rowland told her she was "moving her brother's things from the apartment to a storage unit." (*Id*. at 74:14–15.) In any event, agents found the TV stand on the back seat of Ms. Rowland's car. (*Id*. at 74:22–75:14, 92:3–7.) Hidden in a secret, motor operated compartment within the stand were two rifles, complete with obliterated serial numbers and adapted to operate with the AK-47 drum magazine found during the initial search. (*Id*. at 76:4–77:2; Government Ex. 14A, 14B and 15.)

II

The Bail Reform Act, 18 U.S.C. § 3142, governs pretrial detention. The Act provides that "subject to rebuttal by the person, it shall be presumed that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community if the judicial officer finds that there is probable cause to believe that the person committed . . . an offense for which a

---

²     In fact, as Special Agent Brewer explained, Park Plaza is a "luxurious" high rise condominium building with a concierge and management present. A "FOB card" is necessary to scan into the building. *See* (Hr'g Tr. 51:18–21). Debra Ingalls, Mr. Rowland's mother, agreed that if people manning the lobby think you don't belong there, they won't let you in. (*Id*. at 37:18–25.)

3

maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act." *Id*.

The offense with which Rowland has been charged carries a mandatory minimum of ten years imprisonment and a maximum of life imprisonment. 21 U.S.C. § 841(b). There is probable cause to believe that Rowland violated 21 U.S.C. §§ 846 and 841(b)(1)(A) because of the grand jury's indictment and the facts proffered by the government. *See United States v. Suppa*, 799 F.2d 115, 119 (3d Cir. 1986) (holding that an indictment is sufficient to support a finding of probable cause triggering the rebuttable presumption). The Court thus must presume "that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community." 18 U.S.C. § 3142(e).

Once this presumption arises, the burden shifts to Rowland to "produce some credible evidence forming a basis for his contention that he will appear and will not pose a threat to the community." *United States v. Carbone*, 793 F.2d 559, 560 (3d Cir. 1986). Section 3142(g) of the Bail Reform Act provides factors the Court must review to determine if Rowland has satisfied that burden:

> (1) The nature and circumstances of the offense charged, including whether the offense is a crime of violence or involves a narcotic drug;
>
> (2) The weight of the evidence against the person;
>
> (3) The history and characteristics of the person, including-
>
>> (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and
>>
>> (B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing,

4

>appeal, or completion of sentence for an offense under Federal, State, or local law; and

>(4) The nature and seriousness of the danger to any person in the community that would be posed by the person's release.

18 U.S.C. § 3142(g).

"The quantum of evidence required to rebut the presumption is not high. Rather, the defendant need only come forth with credible evidence conflicting the presumption." *United States v. Gibson*, 481 F. Supp. 2d 419, 422 (W.D. Pa. 2007); *see also Carbone*, 793 F.2d at 560. Even if a defendant rebuts the presumption of dangerousness or flight, however, the presumption does not disappear entirely, but remains a factor to be considered among those weighed by the Court. *See, e.g., id.* at 560–61. To order pretrial detention once the presumption has been rebutted, the Court must find by a preponderance of evidence that no conditions can reasonably assure the defendant's appearance at trial or by clear and convincing evidence that no combination of conditions will reasonably assure the safety of the community. *See, e.g., United States v. Perry*, 788 F.2d 100, 111 (3d Cir. 1986); *United States v. Himler*, 797 F.2d 156, 161 (3d Cir. 1986). The Court reviews the factors and makes this determination *de novo*. *See United States v. Delker*, 757 F.2d 1390, 1394 (3d Cir. 1985). Rowland offers no credible evidence to rebut the presumption that no condition or combination of conditions will assure his appearance or the safety of the community. Even if he had, the evidence presented at the hearing virtually compels Rowland's continued detention.

III

The first § 3142(g) factor—the nature and circumstances of the offenses—weigh in favor of keeping Rowland locked up. He is charged with a very serious crime

5

involving the trafficking of large quantities of methamphetamine. According to the government, Rowland faces a likely sentencing guideline range of 360 months to life imprisonment if convicted. *See* (Resp. Opp'n Mot. at 4; 21 U.S.C. § 841(b)(1)(A)). The circumstances surrounding the alleged offense are also troubling. When they arrested Rowland, FBI agents found a loaded handgun, a full magazine for use in an AK-47 assault rifle and two such rifles in a hidden compartment in the TV stand, which his sister fairly obviously had tried to sneak out of the condo to prevent law enforcement from tying them to her brother.

The second factor—weight of the evidence—also weighs in favor of continued detention. Special Agent Brewer testified to the results of the search of Unit 14Q in the Park Plaza, including the methamphetamine, cash and expensive cars. (Hr'g Tr. 64:9–78:2.) Rowland does not dispute the contents of the search, but instead claims that he didn't live there. He (and his sister) contend that the place is instead a shared "clubhouse" to which multiple people had access. (*Id*. at 6:9–12, 18:23.) When interviewed by Pretrial Services in advance of his December 19, 2018 detention hearing, Rowland stated that his residence was 7152 Lawndale Avenue in Philadelphia and that he has lived there for the last 22 years. (Pretrial Services Report at 1.) Rowland's sister verified this information to Pretrial Services, but Rowland's counsel admitted at the hearing that the Lawndale Avenue house was "not his residence at the time of his arrest." (*Id*.; Hr'g Tr. at 31:2–3.) Mrs. Ingalls, Rowland's mother, told Pretrial Services that the "defendant's fiancée and their child do not currently live at the Lawndale street address." (Mem. Pretrial Services at 1.) Instead, Mrs. Ingalls testified at the hearing that Rowland lived at 8410 Sentinel Road in Eagleville,

6

Pennsylvania. (*Id.* at 34:19–25.) Rowland's counsel also proffered that Rowland resides at the Eagleville address. (*Id.* at 31:14–18.)

The government put forth extensive evidence that Rowland lived in the Park Plaza, including: testimony from Special Agent Brewer that building security said that Rowland occupied 14Q, (*id.* at 52:22–23); testimony from Rowland's mother that, when she went with Rowland to the Park Plaza, security at the front desk let him through without question but had to check her in, (*id.* at 37:18–38:13); a unit remodeling request submitted by Rowland to Park Plaza management on May 23, 2018 that listed Rowland as the Unit Owner, (Hr'g Tr. 54:11–56:1; Government Ex. 2); pictures of two cars (a Maserati and a Ford Taurus SHO) parked in the Park Plaza basement that Special Agent Brewer identified as driven by Rowland, (Hr'g Tr. 58:2–61:8; Government Ex. 3 and 4); a Park Plaza report from July 4, 2018 that describes an incident in which Rowland asked the front desk to "come and get [a person banging on his door] away from his unit," (Hr'g Tr. 61:9–62:23; Government Ex. 5) and physical surveillance performed by the Special Agent, (Hr'g Tr. 62:24–64:8).

The third factor—Rowland's personal history and characteristics—also warrant Rowland's continued incarceration. Rowland has several criminal convictions, violent and weapons related offenses included among them. In 1999, Rowland pled guilty to carrying firearms without a license and was sentenced to two to five years in prison. *See* (Government Ex. 1A). That same year, Rowland pled guilty to manufacturing, delivering or possessing with intent to distribute a controlled substance and was sentenced to one to three years in prison, concurrent to the previous conviction. *Id.* In 2000, Rowland pled guilty to robbery, carjacking, aggravated assault and carrying

7

firearms without a license and was sentenced to six to twelve years in prison. *Id*. Moreover, Rowland has several aliases, including Rasheed Rollin, Author Rollin, Karie Smith, Arthur Rollin, Shaquar Roland, Darie Rollin and William Shakor. *See* (Government Ex. 1B).

Rowland has no known employment. In his Motion, Rowland claims that "he has been employed in the construction trades on and off for the past 15 years. If released, he would be employed immediately as a laborer in the electrician union." (Mot. at 5.) However, during his initial interview with Pretrial Services, Rowland reported employment "as a barber for the past three years, along with employment as a residential aide, and a driver for a local company, all within the past 10 years." (Mem. Pretrial Services at 2.) He did not mention any employment as a laborer in the electrical union. At the hearing on the Motion, Rowland provided the Court with a barber's license issued to him in 2006. *See* (Def. Ex. 2). Despite this modest work experience, Rowland lived a luxurious lifestyle. He stayed in the Park Plaza and drove the Maserati and a Ford Taurus SHO, the civilian version of the Police Interceptor, (*id*. at 58:14–61:6). When he was arrested, police found large wads of cash and jewelry, including a diamond-studded necklace with his nickname. *See* (*id*. at 70:2–71:1).

Rowland nonetheless contends that his personal history demonstrates that he is not a flight risk. He claims he has significant ties to the Philadelphia area and states that he would live at his mother's house if released. Numerous members of the community provided letters to the Court that highlight "Author" Rowland's good character, none of which merit any weight. He proposes conditions that he claims would assure his appearance at trial, including GPS and other electronic monitoring.

*See* (Mot. at 12). He offers to post his friend Robert Reed's property at 417 North Sickles Street in Philadelphia as collateral.[3] None of this is of any comfort. Rowland personifies a flight risk and may very well, in light of the lengthy prison term he faces, not show up for his trial—under any of the aliases he has used in the past.

With respect to the final factor—danger to the community—several considerations weigh in favor of detention. Rowland has a serious criminal history, including multiple violent offenses such as aggravated assault and carjacking. Rowland also poses a danger to the community because of the likelihood that he will, if released, traffic illicit drugs. *See Perry*, 788 F.2d at 111 (danger to community arises from the likelihood that the defendant will, if released, commit one of the proscribed federal offenses); *cf. United States v. Strong*, 775 F.2d 504, 507 (3d Cir. 1985) (statutory language unequivocally establishes that Congress intended to equate traffic in drugs with a danger to the community). This danger is more pronounced by the numerous firearms, including two AK-47s with a stocked 73 round supplemental magazine, recovered by the FBI during the search.

An appropriate order follows.

---

[3] According to its Philadelphia Real Estate Transfer Tax Certificate, the property has an actual cash consideration of $6,400. *See* (Hr'g Tr. 110:6–8). While Reed is "like a brother" to Rowland, (*id.* at 42:13–14), counsel chose not to have Reed testify at the hearing. *See* (*id.* at 24:6–25). Also, as the government highlighted in closing arguments, *see* (*id.* at 115:6–9), despite Rowland's mother owning her own home, (*id.* at 38:22–25), she did not offer to post that home as security for Rowland's release.

9

BY THE COURT:


***/s/ Gerald J. Pappert***
GERALD J. PAPPERT, J.