UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

```
UNITED STATES OF AMERICA .    Case Nos. 18-CR-579-02 & 04
                          .
                          .
          v.              .    James A. Byrne U.S. Courthouse
                          .    601 Market Street
ARTHUR ROWLAND,           .    Philadelphia, PA 19106
HAKIM WILLIAMS            .    (Heard in court)
                          .
          Defendants.     .    October 7, 2021
. . . . . . . . . . . . ..      10:10 a.m.
```

TRANSCRIPT OF FINAL PRETRIAL CONFERENCE HEARING
BEFORE HONORABLE GERALD J. PAPPERT
UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

For the Government:          Office of the U.S. Attorney
                             By: PAUL G. SHAPIRO, ESQ.
                                 TIMOTHY MULLIGAN STENGEL,
                                   ESQ.
                             615 Chestnut Street, Suite 1250
                             Philadelphia, PA  19106


For Defendant, Arthur        Guy R. Sciolla Attorney at Law
Rowland:                     By:  GUY R. SCIOLLA, ESQ.
                             1910 Land Title Building
                             100 South Broad Street
                             Philadelphia, PA 19110

                             Ellis Legal, LLC
                             By:  PANATELLAS PALAVIDAS, ESQ.
                             100 S. Broad Street, Suite 1910
                             Philadelphia, PA 19110


Audio Operator:              Jeff Lucini


Proceedings recorded by electronic sound recording, transcript
produced by transcription service

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@jjcourt.com**

**(609) 586-2311    Fax No. (609) 587-3599**

2

```
APPEARANCES CONT'D:

For Defendant, Hakim        Montoya Coleman LLC
Williams:                   By:  JOSEPH L. COLEMAN, ESQ.
                            100 S. Broad Street, Suite 1216
                            Philadelphia, PA 19110

                            Law Office of Margaret M. Grasso
                            By:  MARGARET M. GRASSO, ESQ.
                            1800 John F. Kennedy Blvd.
                            Suite 300
                            Philadelphia, PA 19103
```

1            THE COURT:  I've been told you were the first to

2  arrive today.

3            MR. SCIOLLA:  I was.

4            THE COURT:  We have dually noted that.

5            MR. SCIOLLA:  In spite of myself.

6            THE COURT:  Thank you.

7            MR. SCIOLLA:  Thank you, sir.

8            THE COURT:  All right.  So, Mr. Sciolla, you're doing

9  well.

10            MR. SCIOLLA:  I'm hanging in there for an old guy.

11            THE COURT:  Mr. Rowland.  Mr. Rowland, good morning.

12            MR. ROWLAND:  Good morning.

13            THE COURT:  And with you, sir?

14            MR. PALIVIDAS:  Mr. Palividas.  Good morning, Your

15  Honor.

16            MR. SCIOLLA:  Ellis Palividas, Judge.  He's actually

17  attorney of record.  He's going to be with me throughout the

18  trial.

19            THE COURT:  All right.  Pronounce your last name?

20            MR. PALIVIDAS:  Palividas, Your Honor.

21            THE COURT:  How --

22            MR. PALIVIDAS:  Palividas.

23            THE COURT:  Palividas?

24            MR. PALIVIDAS:  Yes, sir.

25            THE COURT:  Mr. Palividas, how are you?

1          MR. PALIVIDAS:  I'm well, sir.  Thank you.

2          THE COURT:  Good.  Sorry about that.

3          MR. PALIVIDAS:  No problem.

4          THE COURT:  Mr. Coleman, how you doing?

5          MR. COLEMAN:  I'm good.  Good morning, Your Honor.

6 How are you?

7          THE COURT:  I'm doing fine.  And, Mr. Williams?

8          MR. WILLIAMS:  Good morning, Your Honor.

9          THE COURT:  Good morning.  Mr. Shapiro, good to see

10 you again.  How are you?

11         MR. SHAPIRO:  I'm well, Your Honor, and you?

12         THE COURT:  And is that Mr. Stengel?

13         MR. STENGEL:  It is, Your Honor.

14         THE COURT:  That masked man is Mr. Stengel.

15         MR. STENGEL:  Good morning.

16         THE COURT:  Morning.  And, Agent Becker?

17         AGENT BECKER:  Good morning, Your Honor.

18         THE COURT:  How are you?

19         AGENT BECKER:  I'm good.  How are you?

20         THE COURT:  Everyone, counsel, if you're fully

21 vaccinated and you wish to remove your mask, you may.  That

22 just goes for the people up here, not the folks in the gallery.

23 And, obviously, during the trial that will be the rule, as

24 well.  You can keep it on whenever you want if you don't have a

25 speaking role.  Obviously, lawyers for purposes of trying the

1 case, may have their masks off, as may the witnesses.  So,

2 let's talk.

3          I know we've gone over jury selection and the process

4 before.  The protocols for Covid have relaxed quite a bit over

5 the last year and a half and we're now trying cases normally

6 with the exception of the jury selection.  The jurors, the

7 perspective jurors, will be given clear plastic face masks so

8 that you can see their faces.  They will wear them for the

9 general session.  We will then do the individual voir dire as

10 normal at sidebar, but ask that we all wear masks for the

11 jurors sake, during the individual sidebar.  And then after the

12 jury is selected, the jurors will be asked, they can then trade

13 back into their own masks.  They don't have to wear the clear

14 ones that we give them, and I just ask the jurors to keep their

15 masks on.  We seat them in the jury box as normal, but we just

16 ask them to keep their masks on at all times, including in

17 deliberations unless they're eating or drinking.  So, I for the

18 most part, I wear a mask off and on during the trial more out

19 of solidarity with the jurors, but -- and you can, you know,

20 guide yourselves accordingly.  We have, Jeff, is it 60?

21          COURTROOM DEPUTY:  Sixty.

22          THE COURT:  Okay, and do -- so -- all right, so we

23 have -- we've ordered a group of 60.  May I ask, do the people

24 in the back now intend to be here for jury selection?

25          UNIDENTIFIED SPEAKER:  No.

1                 UNIDENTIFIED SPEAKER:  No.

2                 UNIDENTIFIED SPEAKER:  No.

3                 THE COURT:  No, okay.  Because we won't be able to

4    seat -- no one will be able to sit in the gallery there during

5    jury selection because all the perspective jurors will be

6    there.  If anyone wishes to view jury selection, please let us

7    know and what we would have to do probably is set up a remote

8    courtroom with a video feed, so that members of the public, if

9    they want, can view jury selection.  So, if that's going to be

10   an issue, if any of you have friends or family who are intent

11   on watching jury selection, please let us know so we can

12   accompany that.

13                MR. SCIOLLA:  We would not, Judge.

14                THE COURT:  Okay.  No, okay.  And, so for -- I will

15   seat 12 jurors and two alternates unless -- the one thing I

16   want to talk about, how long -- I know we were talking roughly

17   a week and a half.  There are fewer defendants now.  I don't

18   know if that probably doesn't change the scope of the evidence

19   all that much.  Mr. Shapiro, would you have a ballpark on the

20   length of time it might take the government to put its case in?

21                MR. SHAPIRO:  Yeah, I think, Your Honor, the week and

22   a half was when we were at our current number of participants.

23                THE COURT:  Okay.

24                MR. SHAPIRO:  I think we had moved down from two

25   weeks to a week and a half.  Defense counsel have been very

1 helpful in stipulating out records custodians, and firearms

2 people, and things of that nature.

3          THE COURT:  Okay.

4          MR. SHAPIRO:  I suspect it may -- it may go over one

5 week.  It certainly will not be two.  I mean it's conceivable

6 we could finish it within the week.

7          THE COURT:  So --

8          MR. SHAPIRO:  I wouldn't want to predict that we

9 will, but it's possible.

10          THE COURT:  Six full trial days is a decent, you know

11 -- everything is ballpark.  That's great.  Thank you.  And, not

12 holding the defense to anything, at least as we sit here today,

13 are you contemplating any witnesses?

14          MR. COLEMAN:  No, Your Honor.

15          THE COURT:  Okay.

16          MR. SCIOLLA:  No, Your Honor.

17          THE COURT:  All right.  Thank you.  So, and if there

18 are, obviously, please give me the names so I can read them to

19 perspective jurors, but okay.  With a trial of that length

20 then, I'd probably be comfortable in 12 jurors and two

21 alternates.  Does anybody disagree?  We could go up to more

22 alternates if we needed to, but --

23          MR. SCIOLLA:  I think that's fine, Judge.

24          MR. SHAPIRO:  I was going to suggest more, simply

25 because we have the issue that some jurors at home and they

have a family member who has contact with somebody who has
Covid and now they have to isolate, and so the odds of losing
somebody, it seems to me, are great, but you've had -- I mean,
I know you've had a bunch of trials in the recent past so.

THE COURT:  We have, but they've been short ones.
They've all been two to three days all in, which is why I was
focusing on the length.

MR. SHAPIRO:  So, my worry is that we may lose people
who aren't themselves necessarily sick but who can't come in
because they're -- they have an exposure issue, so it may be we
don't lose the rest of the panel --

THE COURT:  Right.

MR. SHAPIRO:  -- but we may lose several people.

THE COURT:  We could have four alternates.  Seems to
be that -- seems to me, that's what you're hoping for.

MR. SHAPIRO:  Well, that's what -- I'm at least --

THE COURT:  What you think it prudent.

MR. SHAPIRO:  I'm at least tossing it on the table as
a --

THE COURT:  Okay.  Does the defense have any thoughts
on that?

MR. SCIOLLA:  That's fine, Judge.  I wouldn't have a
problem with that and I think probably Paul makes good sense
with that.  God forbid, you know -- of course, the irony would
be that the 16th one or the 15th one is the one that gives us

1    Covid, but -- anyway, I don't have any problem with four.

2            THE COURT:  Well, then that would be -- all right, so

3    we can do that.  So, we would seat 16 people, so with two

4    defendants, who's good at math?  How many would we need to get

5    down to before the peremptories?  And do you want extra strikes

6    for the alternates?  Normally, we'd need to get down to 18.

7            UNIDENTIFIED SPEAKER:  32.

8            THE COURT:  32.

9            UNIDENTIFIED SPEAKER:  Adding two, so 34.

10           THE COURT:  Right.  So, 34 if we add two.  Do you

11   want -- does anybody want extra strikes for the alternates?

12   And, this obviously goes into trying to gage the length of jury

13   selection, right.

14           MR. SCIOLLA:  I think we both would agree one extra.

15           THE COURT:  One extra per side?  So we'd --

16           THE COURT:  Okay.  We'll make a note of that.  One

17   extra per side.  So, we'd need to get to 36 before you start

18   the peremptories.  Sixty is still comfortable, don't you think?

19   Yes, I think so.  I think we're still comfortable at 60 given

20   the -- given the fact that the trial won't be all that long.

21   So, okay, everybody good with that?  That will lengthen jury

22   selection but we have the full day set aside for it next

23   Thursday anyway.  We should be okay.  Just to again quickly

24   remind you, I will -- I have your voir dire questions from the

25   last time.  If there's nothing else either of you -- any of you

1  wish to add, I'm content with taking those questions, working

2  them into the questions from my bench book, and any other

3  questions I typically ask, I'll ask those questions in the

4  general session myself.  We'll have them raise their hand,

5  indicate yes.  We'll keep track.  When I'm done with the

6  general question, I'll turn to you and ask you if there's

7  anything else you'd like to ask me in the general questions,

8  general session.  We'll then invite to sidebar for individual

9  voir dire anyone you wish to invite to sidebar, and we'll have

10 the questioning here.  You'll make your motions for cause here

11 and I'll take care of them right at sidebar, and then we'll

12 just keep moving through until we get 18 people that we're all

13 happy with.  Turn it back to you to exercise your strikes.

14 Jeff will have the form for you.  You can work with him on that

15 and then -- and then we'll seat 16 people accordingly.  Any

16 questions on jury selection at all?

17                    (No audible response)

18          THE COURT:  You look -- you look troubled?

19          MR. SHAPIRO:  I'm just -- I'm just working on -- so

20 it -- the number of strikes are 10 and 6?

21          THE COURT:  With an extra each.

22          UNIDENTIFIED SPEAKER:  12.

23          THE COURT:  It's 11 and 7, right, with a

24 multi-defendant case.

25

 1              UNIDENTIFIED SPEAKER:  7 and 11 normally.

 2              THE COURT:  7 and 11 normally in a two defendant

 3   case.

 4              UNIDENTIFIED SPEAKER:  So it's 8 and 12.

 5              THE COURT:  8 and 12.

 6              UNIDENTIFIED SPEAKER:  Plus the 16 makes 32.

 7              THE COURT:  Plus -- okay.  Right?

 8              MR. SCIOLLA:  That's fine.

 9              THE COURT:  Okay.  You guys look about as good as

10   math -- at math as I am.  But, that's one of the many reasons

11   we have Mr. Lucini running the whole show here, okay.  All

12   right, the -- so, the current procedure, as I mention, is

13   really, you know, we don't have any special protocols for the

14   trial other than the masks that I've spoken about.  Everything

15   else we've been able to, you know, do successfully, so

16   everything has worked great.  Again, if we're going to need

17   places for people to view jury selection, please tell us.  And,

18   if you have any questions on jury selection or court policies

19   and procedures prior to next Thursday, please let us -- reach

20   out to us.

21              With respect to, I'll just stay on the topic of

22   juries here, I went back in the archives and found the most

23   recent draft that we sent back to you of the jury instructions.

24   They were dates January 6th of 2020 and they had a covering

25   e-mail from our chambers, which went through all of the changes

1  that we had made to the proposed jury instructions.  Is there
2  anyone who doesn't have the January 6th version or the covering
3  explanatory e-mail with respect to all the changes?
4           MR. COLEMAN:  Your Honor, I do not have the e-mail.
5           THE COURT:  All right.  Okay.
6           MR. SCIOLLA:  Yeah, I don't think I received the
7  e-mail either, Your Honor.
8           THE COURT:  You got to check your e-mail.
9           MR. SCIOLLA:  It seems I heard that before.
10          THE COURT:  Yes.
11          MR. SCIOLLA:  I'm checking it now.
12          MR. STENGEL:  Your Honor, by the e-mail, do you mean
13 there was a document that had a sort of bullet point
14 explanation, a summary of either no substantive changes or
15 minor edits that -- is that what you mean by the e-mail
16 explaining?
17          THE COURT:  There is an e-mail to each of you.  Dear
18 Counsel, as Judge Pappert discussed on December 23, we attached
19 the most recent version of the proposed jury instructions, our
20 edits to the Government's submission, and reasons for them
21 should be self-explanatory given the comments and by comparing
22 the Government's proposed instructions with these.  And, then
23 we have a multi-page document which explains all our changes.
24 Do you --
25          MR. STENGEL:  I have that, Your Honor, yes.

1              THE COURT:  You have that, Joe?

2              MR. COLEMAN:  Yes.

3              THE COURT:  Okay, so that e-mail was just that then.

4    You don't need the e-mail itself so you --

5              MR. COLEMAN:  Obviously I don't need that, right.

6              THE COURT:  Guy, do you have this?

7              MR. SCIOLLA:  I don't have it with me, Your Honor,

8    but I'm sure I have it.

9              THE COURT:  Well, I'll tell you what, just to make

10   sure, and does the Government have --

11             MR. STENGEL:  Yes, Your Honor.

12             THE COURT:  Okay.  Well, Guy, we'll make a copy for

13   you just to be sure so, you know --

14             MR. SCIOLLA:  That would be great.

15             THE COURT:  -- you'll leave with a copy.

16             MR. SCIOLLA:  Thanks, Judge.

17             THE COURT:  It's been a while, have -- has anyone in

18   the last week in anticipation of this been able to go through

19   the jury instructions?

20             MR. STENGEL:  Yes, Your Honor.

21             THE COURT:  Okay.  Mr. Sciolla?

22             MR. SCIOLLA:  Yes, Your Honor.

23             THE COURT:  And, Mr. Coleman?

24             MR. COLEMAN:  Yes, Your Honor.

25             THE COURT:  Okay.  Anything that you wanted to take

1  up now in realizing that you know we'll have a little time.

2  Usually I'd like to get these put to bed so that in short trial

3  we can just go right into instructing the jury?  These are more

4  substantive and we have a little more time, but any big picture

5  comments, Tim, that --

6          MR. STENGEL:  I don't know that they're big picture

7  comments, Your Honor.  I have one, two, three, four, maybe five

8  of them that I'd like to discuss at some point.

9          THE COURT:  You want to do that now?

10          MR. STENGEL:  Sure.

11          THE COURT:  Okay.  Go -- go right ahead.

12          MR. STENGEL:  Sir, thank you.  I'll just go in order

13  if that's okay --

14          THE COURT:  Yes.

15          MR. STENGEL:  -- going down the summary?  What was

16  Government request 29, indictment in the conjunctive statute

17  and required proof in the disjunctive --

18          THE COURT:  Yes, that's number -- yes, okay.

19          MR. STENGEL:  Yeah, Number 29.  We had -- we had

20  provided a, I wouldn't call it a lengthy explanation of the

21  conjunctive, disjunctive, issue, but --

22          THE COURT:  Which we said is unnecessary and

23  confusing, that --

24          MR. STENGEL:  Exactly, Your Honor.  In the -- in the

25  interests of -- I don't know that I agree --

1                THE COURT:  I'm laughing because  I just had this
2      debate over this same instruction at my most recent trial two
3      weeks ago.
4                MR. STENGEL:  How did it go?
5                THE COURT:  I cried uncle at some point.
6                MR. STENGEL:  Okay.  Okay.
7                THE COURT:  And gave it the --
8                MR. STENGEL:  Okay, well --
9                THE COURT:  There's no way I -- there's no way I
10     could believe the jurors understood a word of what I was
11     saying, but --
12               MR. STENGEL:  So --
13               THE COURT:  -- I read it really well.  I mean, my
14     delivery, my cadence.
15               MR. STENGEL:  I don't -- I don't doubt that, Your
16     Honor.  There is an alternative.  I -- I have used, at least in
17     the past, a somewhat simpler version of it.
18               THE COURT:  Okay.
19               MR. STENGEL:  Which I'm happy to provide to you, but
20     it says something like, before I discuss the elements of the
21     offense charged in the indictment, I'd like to instruct you on
22     the meaning of the word and when it is used in statutes or
23     indictments --
24               THE COURT:  This is the one I gave a week and a half
25     ago.

1          MR. STENGEL:  Except -- hold on.

2          THE COURT:  All right.

3          MR. STENGEL:  Where a statute specifies several

4   alternative ways in which an offense may be committed, the

5   indictment may allege the several ways in the conjunctive.

6   That is by using the word and.  If only one of those

7   alternatives is proved beyond a reasonable doubt, that is

8   sufficient for conviction.

9          THE COURT:  That's better than the one I gave --

10          MR. STENGEL:  Hearing it full stop.

11          THE COURT:  Man, I needed you a week and a half ago.

12          MR. STENGEL:  I'm here.

13          THE COURT:  All right.

14          MR. STENGEL:  So, that's an alternative.  We do --

15          THE COURT:  Okay.

16          MR. STENGEL:  It is the Government's position that

17   that is an appropriate instruction.  Whichever form you'd like

18   to use, we're okay with it.

19          THE COURT:  What you just read will be fine.  You

20   could give it us and --

21          MR. STENGEL:  Okay.

22          THE COURT:  -- share it with counsel and -- I don't

23   object.  There's nothing objectionable to the substance.  I

24   just, you know, obviously where I can and I err on the making

25   sure the jurors hear whatever counsel thinks they need to hear,

1  but for obvious reasons, try to trim them down and remove

2  repetitiveness, and particularly in a case like this where the

3  instructions will take probably about an hour to read.

4            MR. STENGEL:  Understood.  Understood, Your Honor.

5            THE COURT:  And I do give them to the jury, as well,

6  as you know.  I give each of the jurors a set for their

7  deliberations.  Yes.

8            MR. STENGEL:  Okay, I do --

9            THE COURT:  Yes.

10            MR. STENGEL:  I do recall that so --

11            THE COURT:  Okay.

12            MR. STENGEL:  -- on your point of cutting

13  instructions that are duplicative, Number 41, Government

14  Request 41, which was a method of proving knowledge which use

15  cut as duplicative of the knowingly and intentionally

16  instruction.

17            THE COURT:  Understood, okay.  Got it.

18            MR. STENGEL:  I don't think that it's -- it is

19  duplicative, but rather complimentary.  The -- you -- the Court

20  references Government Request 40, in which we would instruct,

21  this is the burden of what the Government has to prove.  41

22  really speaks to a method through which we are able to meet

23  that burden.  So, I don't know that they're duplicative, but

24  rather complimentary, and it would be our -- it's our position

25  that 41 should be included along with 40.

1          THE COURT:  Okay.

2          MR. STENGEL:  You had a very similar instruction in

3     47, but then had also proposed that we just combine that with

4     an earlier method of proving knowingly and intentionally, and

5     we are -- I think that makes perfect sense not to read the same

6     instruction twice.

7          THE COURT:  Okay.

8          MR. STENGEL:  Government Request 51,

9     attempt-impossibility, this is another one that --

10          THE COURT:  Got it.

11          MR. STENGEL:  -- you rejected as unnecessary, and

12     this one is potentially violative of the jury's fact finding

13     role.  We had provided a somewhat fact specific explanation for

14     this one and I -- I take Your Honor's point about the violating

15     the jury's fact finding role.  But, there was a final sentence

16     in the paragraph that you cut, which I do think is appropriate

17     and makes the instruction more clear, and that's the sentence,

18     as long as you find the Government has proven beyond a

19     reasonable doubt that the defendant defended to possess a

20     controlled substance with intent to distribute and took a

21     substantial step toward committing that offense, you may find

22     the defendant guilty of an attempt even though he never

23     actually completed the crime.

24          THE COURT:  Obviously, a correct statement of the law

25     in looking at this now, isn't that covered in what would be

1  presumably an earlier instruction giving the elements of the

2  attempt charge.

3          MR. STENGEL:  I'm looking at Number 50 and Number 50

4  closes with respect to the substantial step, you may not find

5  that the --

6          THE COURT:  Yes.

7          MR. STENGEL:  -- defendant guilty of attempting to

8  possess methamphetamine with intent to distribute it, merely

9  because he made some plans to or some preparation for

10  committing that crime.  Instead, he must find that the

11  defendant took some firm, clear, and undeniable action to

12  accomplish his intent.  So, that really deals more with a

13  substantial step.  This deals with the fact that it was whether

14  the completion was impossible.  In this case, because the

15  packages were -- were seized by the Government, so --

16          THE COURT:  Okay.

17          MR. STENGEL:  -- there was no -- no time for the

18  defendants to have completed that crime, and they can't make

19  the argument that that is somehow a defense to the attempt.

20          THE COURT:  So, the -- what you read there, Mr.

21  Stengel --

22          MR. STENGEL:  Yes.

23          THE COURT:  -- I don't -- let's see, do I have that

24  one in front of me?

25          MR. STENGEL:  You -- it would be in the Government's

1  suggested jury instructions.  It's the last sentence of the
2  second paragraph, the paragraph which we added.
3          THE COURT:  Of Number -- of Number 51?
4          MR. STENGEL:  Yes, sir.
5          THE COURT:  Let's see.  You know what, I may -- I
6  don't have your initial -- all I have is our modifications.
7  Would you mind giving me that what you just read?
8          MR. STENGEL:  Not at all.
9          THE COURT:  If you have an extra copy, and we can
10 work that back in and obviously --
11         MR. STENGEL:  Sure.  I also -- I've typed all this
12 out.  I'm happy to e-mail it to Chambers after the fact if that
13 would be helpful.
14         THE COURT:  That would be great.
15         MR. STENGEL:  Okay.
16         THE COURT:  That would be great.  Appreciate that.
17 I'll -- do you mind if I take it in the interim?
18         MR. STENGEL:  Not at all.
19         THE COURT:  Okay, great.  Thank you.  That was 51,
20 okay.
21         MR. STENGEL:  Number 53, the quantity of drug
22 interrogatory.
23         THE COURT:  Yes, got it.
24         MR. STENGEL:  You had it at the time, rejected -- or
25 edited this to be more consistent with Phillips, and at the

time, though our office's practice was to request instructions
that were not necessarily in line with Phillips, your decision
was absolutely correct.  Since then, the Third Circuit has
handed down the Williams case, which did change the jury
instruction as to --

THE COURT:  Okay.

MR. STENGEL:  -- drug weight, such that we need to
find a -- the statutory maximum penalty is determined -- excuse
me, the mandatory minimum term of imprisonment is determined
separately for each defendant.

THE COURT:  Was -- Williams was within the last year
and a half, wasn't it?

MR. STENGEL:  It was -- yes, it was March 2020, so it
was after --

THE COURT:  After this, okay.

MR. STENGEL:  -- we had talked about this.  Yeah.

THE COURT:  Okay.  Yes, if -- then let's -- that's
Number 53.  If you have a proposed update to that that's in
line with the Third Circuit's decision in Williams, we'll work
that in.

MR. STENGEL:  I do.  I have the one that we had
previously submitted, so I can e-mail that --

THE COURT:  Okay.

MR. STENGEL:  -- to Chambers as well if that's --

THE COURT:  Please.  Okay, great.

1          UNIDENTIFIED SPEAKER:  Would you send me a copy of

2    that?

3          MR. STENGEL:  Absolutely, yeah.

4          MR. SCIOLLA:  So that's going to change Number 53?

5          MR. STENGEL:  It will change Number 53.  Yes,

6    absolutely.

7          MR. SCIOLLA:  Okay.

8          MR. STENGEL:  Number 62 and 63, you had edited our

9    bifurcated of possession of a firearm by a felon count such

10   that they were -- such that they would comply better with the

11   Rahaif decision.

12         THE COURT:  Right.

13         MR. STENGEL:  Since that, the Third Circuit model

14   instructions have been amended to include a post Rahaif

15   instruction.

16         THE COURT:  Yes.

17         MR. STENGEL:  Your instruction is strikingly on

18   point, but it's not exactly so I'm just drawing your attention

19   --

20         THE COURT:  That's a nice way to -- that's a nice way

21   to state that.  Thank you.

22         MR. STENGEL:  So, if you -- you're prescient there,

23   Your Honor, but if you -- if --

24         THE COURT:  Okay.

25         MR. STENGEL:  I'm just flagging it in case you want

1  to follow the model instruction --

2          THE COURT:  So we now have an updated model that

3  reflects --

4          MR. STENGEL:  We do.  We do.

5          THE COURT:  -- Rahaif and that's what we'll give.

6          MR. STENGEL:  We do.

7          THE COURT:  Okay.

8          MR. STENGEL:  And that's all I have, Your Honor.

9          THE COURT:  That's perfect.  Thank you.

10         MR. STENGEL:  Thank you.

11         THE COURT:  Obviously, Mr. Coleman, Mr. Sciolla, will

12 send these back around again.  Mr. Shapiro and Mr. Stengel,

13 having tried cases before me before know that it's kind of an

14 iterative process with me with the jury instructions.  We send

15 them back and forth throughout the trial.  We discuss them, you

16 know, periodically, because I just don't like to have a lot of

17 down time between closing statements and charging the jury.

18         MR. SCIOLLA:  That's fine, Judge.

19         THE COURT:  Yes, okay.

20         MR. SCIOLLA:  I do have your memo and --

21         THE COURT:  Oh, you do.  Okay.

22         MR. SCIOLLA:  Yeah.  I've been following everything

23 on the --

24         THE COURT:  So, this one, Guy?

25         MR. SCIOLLA:  Yeah.  I'm all set.

1           THE COURT:  Okay, so you -- you do have it.  Okay.

2           MR. SCIOLLA:  I checked my e-mail today.  But, if it

3  would be okay, when you're final instructions are complete, if

4  we could just get a copy of those?

5           THE COURT:  Oh, absolutely.  We will --

6           MR. SCIOLLA:  Just the amendment.

7           THE COURT:  We will implement -- we will update the

8  version to include the points, the changes Mr. Stengel has

9  asked for, for the reasons he asked for them.  We will date

10 that draft.  We'll probably have that out to you next week

11 early.  We'll date -- we'll circulate that to everybody.

12          MR. SCIOLLA:  Great.

13          THE COURT:  By e-mail.  Okay, good stuff.  Mr.

14 Stengel, thank you.  That's very helpful.

15          MR. STENGEL:  Thank you, Your Honor.

16          THE COURT:  All right.  I have the Government's --

17 and obviously we have -- I'm assuming that in the next -- what

18 I -- what you'll see obviously is where we needed to do so, by

19 the time we put these jury instructions together, Ms. Bradford,

20 was -- we have removed references to all the defendants who are

21 no longer going to trial.  Okay.  All right.  The Government's

22 witness list, I know I just had somewhere.  Okay.  All right,

23 so in reading Mr. Akwaboah's name, should I say he's from Los

24 Angeles?

25          MR. STENGEL:  Yeah, that makes sense.

1          THE COURT:  And, obviously, Agent Becker is with the

2     Philadelphia FBI, right?

3          AGENT BECKER:  Yes.

4          THE COURT:  Ms. Bradford, should I also describe her

5     as being from Los Angeles?

6          MR. STENGEL:  Yes, Your Honor.

7          THE COURT:  Okay.  And, remind me please Timothy

8     Buck?

9          MR. SHAPIRO:  He was the former owner of 3900 Ford

10    Road apartment.

11         THE COURT:  Okay.

12         MR. SHAPIRO:  He currently resides in Florida, but he

13    did live here until he retired to Florida.

14         THE COURT:  Formerly of Philadelphia, now lives in

15    Florida.  Do we know Anthony Colarulo's rank with the PPD, not

16    that that's dispositive?

17         UNIDENTIFIED SPEAKER:  He's a police officer.

18         THE COURT:  Officer, okay.  Special Agent Clint, and

19    it's Chlebowski, as I remember, FBI, Philadelphia, as well,

20    right?

21         MR. STENGEL:  He's actually out of Harrisburg, Your

22    Honor.

23         THE COURT:  Oh.

24         MR. STENGEL:  Formerly of Philadelphia.

25         THE COURT:  Kevin Coleman, special agent?

1                MR. SHAPIRO:  Special agent, yes.  I omitted that.

2                THE COURT:  That's okay.  And Philly?

3                MR. SHAPIRO:  He is in Washington D.C., but formerly

4    of here.

5                THE COURT:  How do I pronounce the next name,

6    Guerschon?

7                MR. SHAPIRO:  I believe that's correct.

8                THE COURT:  Guerschon, is it Dede?

9                AGENT BECKER:  Yes, Your Honor.

10               THE COURT:  And male, female?

11               AGENT BECKER:  Male, Your Honor.

12               THE COURT:  And, just in from Philadelphia?

13               AGENT BECKER:  Yes.

14               THE COURT:  Christian Pfeiffer (phonetic) --

15               MR. SHAPIRO:  Yes.

16               THE COURT:  Hoffern (phonetic), California police

17   officer?

18               AGENT BECKER:  Police officer, yes.

19               THE COURT:  Eric Frank, I assume that's Brea.

20               AGENT BECKER:  Yeah, the City of Brea, and he's a

21   sergeant, Eric Frank, now.

22               THE COURT:  Special Agent Korrina George?

23               AGENT BECKER:  Yes.

24               THE COURT:  FBI Philly?

25               AGENT BECKER:  Formerly Philly, Your Honor.  I'm not

1   -- D.C. area.  I'm not really sure.

2          THE COURT:  Special Agent Eugene Giallombardo?

3          MR. STENGEL:  Yes, Your Honor.

4          THE COURT:  DEA, Philly.

5          MR. SHAPIRO:  Yes.

6          THE COURT:  Special Supervisory Special Agent James

7   Kreiger (phonetic)?

8          MR. SHAPIRO:  Yes.

9          AGENT BECKER:  Philadelphia.

10          MR. SHAPIRO:  Kerry Martin (phonetic).

11          MR. SHAPIRO:  Philadelphia.

12          THE COURT:  Are these just citizens?  She has no

13   title or -- okay.

14          AGENT BECKER:  That's correct.

15          THE COURT:  Special Agent Derek Parker (phonetic),

16   FBI, Philadelphia?

17          MR. STENGEL:  He's actually from the Southern

18   District of Illinois, Your Honor, Springfield, Illinois.

19          THE COURT:  Oh, okay.  Robert Purnell.

20          MR. SHAPIRO:  Philadelphia.

21          THE COURT:  Citizen?

22          AGENT BECKER:  Yes.

23          MR. STENGEL:  Yes.

24          THE COURT:  Special Agent Charles Simpson.  I know

25   Agent Simpson.  He's still in Philly, right?

1          AGENT BECKER:  No, Your Honor.  He's actually a

2    supervisory special agent now out of Newark.

3          THE COURT:  Oh, okay.  James Spurnak (phonetic).

4          MR. SHAPIRO:  Los Angeles also.

5          THE COURT:  And Stacy Woods (phonetic).

6          MR. SHAPIRO:  Is here.

7          THE COURT:  Philly, okay.  Very good.  Thanks for

8    that list.  I appreciate it.  Work that in.  Okay.

9    Stipulations, be they witnesses, legal issues, stipulations of

10   fact.  Obviously, we will work those into the appropriate model

11   jury instruction.  I will, if they are stipulations as to what

12   a witness would say, I can read that stipulated testimony to

13   the jury at the time you would present it.  I would then reread

14   it probably giving the final instructions and the stipulations

15   in the final jury instructions.  What's the scope of the

16   stipulations we have?  I know records custodians.

17          MR. SHAPIRO:  So, and -- we had two sets, if the

18   Court recalls, at the semi-final final conference.

19          THE COURT:  Right.

20          MR. SHAPIRO:  And, so we have those same ones, and

21   then there's an addition set that counsel have agreed to in

22   principle.  We're still --

23          THE COURT:  Okay.

24          MR. SHAPIRO:  I'm still waiting to hear if there are

25   objections to language.  But, I can provide sets to the Court

1  now and you can --

2          THE COURT:  Would you want -- would you prefer to

3  wait and resolve any -- all the remaining hanging chads and

4  then just give me one master list or I'll take what you have

5  now?  Happy to do that.

6          MR. SHAPIRO:  Yeah, I was -- I was going to just --

7  and they -- they are sort of separate by subject matter.

8          THE COURT:  Oh, okay.  Okay.

9          MR. SHAPIRO:  And the first two are separated from

10 each other because ones that are firearms related ones that

11 would go in the bifurcated case.  So, I mean, I don't expect

12 that there are going to be substantial changes and it will give

13 Your Honor a sense of where we're headed.

14         THE COURT:  Perfect, okay.

15         MR. SHAPIRO:  So if I may?

16         THE COURT:  Yes.

17         MR. SHAPIRO:  I have copies for everybody.

18         THE COURT:  Great.  This is the same.  No, okay.

19 Okay, as to -- good.  Perfect.  These are great.  Thank you so

20 much to counsel on both sides.  Appreciate it very much.

21 Great.

22         MR. SHAPIRO:  It really will allow us to move along

23 much --

24         THE COURT:  I appreciate that very much.  Yes, it

25 will.  Thank you.  That's fantastic.  Okay.  Have -- has the

1  Government -- how are we on the trial exhibits?  Have they yet

2  been shared with defense counsel?  Has defense counsel had an

3  opportunity to review, object, and anything?  Where are we in

4  that process?

5           MR. SHAPIRO:  So, the answer to the first part of

6  that question is mostly yes, and the answer to the second part

7  is pretty much no.

8           THE COURT:  Okay.

9           MR. SHAPIRO:  So, they were at my office yesterday

10 and I provided them with a disk that contains the vast

11 majority, copies of the vast majority of the exhibits.

12          THE COURT:  All right.

13          MR. SHAPIRO:  So, they do have them, but

14 realistically they haven't had an opportunity to go through

15 them.

16          THE COURT:  All right.

17          MR. SHAPIRO:  I have provided them with an exhibit

18 list that I e-mailed them late last night and I can provide the

19 Court --

20          THE COURT:  Yes, please.

21          MR. SHAPIRO:  -- with a copy as well.  And, I expect,

22 based on our conversation yesterday, that there aren't going to

23 be any serious issues, and if there are, there aren't going to

24 be many of them.

25          THE COURT:  Okay.  Thank you.

1          MR. SHAPIRO:  My expectation is that we will have

2   books, one for each counsel, one for the witness, one for the

3   Court.  Does the Court want two?  One for Your Honor's law

4   clerk?

5          THE COURT:  Yes, please.  Yes, please.

6          MR. SHAPIRO:  Two for the Court and one for us.  But

7   -- and if it's all right for the Court, I would be inclined to

8   leave a book on the witness stand because --

9          THE COURT:  That would be great.

10          MR. SHAPIRO:  -- many witnesses find it easier.

11          THE COURT:  Yes.  Okay.  Thank you very much for

12   this.  And, to defense counsel, I know you've just gotten the

13   disc with these.  If you could please look them over between

14   now and next Thursday, and if there are any that are going to

15   present any issues that I have to take up, I'd love to be able

16   to at least know what they are before we begin the trial.

17          MR. COLEMAN:  Yes, Your Honor.

18          THE COURT:  Okay.  Thank you very much.  Will we have

19   any live expert witnesses now or has everything been stipulated

20   to with experts?  Expert witnesses?

21          MR. SHAPIRO:  The only -- the only issue, there will

22   be one drug trafficking expert who will testify and he's

23   indicated on the list.

24          THE COURT:  Yes, and that is?

25          MR. SHAPIRO:  You did so well with his name last

1  time, Your Honor.  Gialumbarto.

2          THE COURT:  Got it.

3          MR. SHAPIRO:  But, other than that --

4          THE COURT:  And that will be the standard testimony

5  based on his experience as to lingo and all that other stuff?

6  Okay.

7          MR. SHAPIRO:  And tools of the trade.

8          THE COURT:  Tools of the trade, okay.  But, he's not

9  the over -- is the over -- he's not the overview person, right?

10         MR. SHAPIRO:  No.

11         THE COURT:  Yes.

12         MR. SHAPIRO:  And, actually, that's a perfect segue.

13 So, Agent Becker will -- we expect, as long as the Court

14 doesn't have a problem, to have her testify twice, once toward

15 the front of the trial to explain how the investigation went,

16 and then once at the end as a summary witness.

17         THE COURT:  Yes, that's fine.  Okay.  And, if

18 obviously the defense anticipates any objections to Agent

19 Gialumbarto's expert testimony on drug trafficking, please let

20 me know.

21         MR. COLEMAN:  Yes, Your Honor.

22         THE COURT:  Okay.

23         MR. SCIOLLA:  Is there a CD for him available?

24         UNIDENTIFIED SPEAKER:  Yes.

25         THE COURT:  I'm sure it will be in the stuff that

1  you've been given if it --

2          MR. SHAPIRO:  So, we will send them the required

3  letter outlining testimony and the CD shortly.

4          THE COURT:  Thank you.  Okay, great.  Any issues

5  anticipated with respect to lay opinion witness testimony Rule

6  701 stuff?  It's kind of a blurry area.  I know.  I don't think

7  the overview witnesses fall into that.  The drug trafficking

8  witness will be an expert.  I think that should probably not be

9  an issue.

10          MR. SHAPIRO:  I don't think it's going to be an

11  issue.  The only -- the place that it would come up would be,

12  several of the agents are going to testify about carrying out

13  searches and so they will be testifying about what they did and

14  how they did it, but they of course are --

15          THE COURT:  They're there.  That's a -- that's --

16          MR. SHAPIRO:  They have a level of expertise and so

17  they draw on that in doing what they do, so those are the kinds

18  of witnesses where that issue can arise, but --

19          THE COURT:  Okay.

20          MR. SHAPIRO:  -- particularly given that we have the

21  expert who is going to testify as an expert.  I don't foresee

22  it being an issue.

23          THE COURT:  Okay, thank you.  Do you have an updated

24  and mercifully much shorter verdict form?  Not yet?

25          MR. SHAPIRO:  Not yet.

1           THE COURT:  That's okay.  Next -- next Thursday is

2    fine.

3           MR. SHAPIRO:  Oh, right --

4           THE COURT:  The last one was really long because it

5    had everybody in it.

6           MR. SHAPIRO:  So, it's -- Mr. Stengel points out to

7    me that on the upside, we're going to lose some defendants so

8    we'll lose some questions.  But, on the downside, with the

9    Williams case, there may be more questions to be added so.

10          THE COURT:  Okay.  By next week?

11          MR. STENGEL:  Not a problem.

12          THE COURT:  Not a -- great.  Thank you.  The -- your

13   trial memorandum remains the same with the exception of

14   deletions of -- okay.  So, we had -- there were evidentiary

15   issues, I'll turn to defense counsel, that were outlined in the

16   trial memorandum that I just want to make sure you're all okay

17   with these issues that, as you know, obviously come up

18   frequently in these types of cases, but summary charts.  It

19   seems I didn't look through it.  Might there be a stipulation

20   that will relieve us of the need to present the 922G-1 counts

21   to the jury afterwards?  Are we still -- I thought I saw a

22   stipulation that might take care of that.  No?

23          MR. SHAPIRO:  It's still going to have to be

24   bifurcated.  I don't know that there will be actual testimony.

25          THE COURT:  Oh, yes.  No, no.  We'll bifurcate it but

1  --

2      MR. SHAPIRO:  But I don't -- I don't -- I think the

3  stipulations will avoid the necessity of testimony as to

4  status.

5      THE COURT:  Got it.  Got it, okay.

6      MR. SCIOLLA:  I would agree.

7      THE COURT:  Were there any other legal issues

8  outlined in the Government's trial memorandum with which the

9  defense disagreed or wants to raise argument or objection?  The

10  presentation of summary charts under 1006, I think it is, the

11  evidence of the possession of firearms as part of drug

12  trafficking, the appropriate redaction of Mr. Williams' post

13  Miranda statements, such that they are used only against him

14  and any other defendants for the Bruton issues.  We'll -- Mr.

15  Shapiro and Mr. Stengel, are there references in Mr. Williams'

16  statements to defendant's other than Mr. Rowland with those

17  witnesses -- with those people now either not being part of the

18  case or having changed their plea, do those need to be redacted

19  as well?

20      MR. SHAPIRO:  So, the answer to the first part of

21  that question it, I believe, and Mr. Coleman can correct me if

22  I'm wrong, I believe the only one is Mr. Banks who will be

23  testifying anyway.

24      THE COURT:  Okay.

25      MR. SHAPIRO:  So, I don't think factually --

1           THE COURT:  So we don't have to worry about that.

2           MR. SHAPIRO:  -- it's a problem.

3           THE COURT:  Okay.

4           MR. SHAPIRO:  But I don't know that -- I don't think

5  legally -- it's certainly not a Bruton problem anyway because

6  they don't have --

7           THE COURT:  Right.

8           MR. SHAPIRO:  -- they don't have a dog in the fight.

9           THE COURT:  Right.  Agree.

10          MR. COLEMAN:  I seem to recall, of course look at the

11 video again, but I seem to recall that it was only dealing with

12 banks.  There may have been mention of Ms. Bradford, Danielle

13 Bradford, but I know she pled also so.

14          THE COURT:  And she's going to testify?

15          MR. SHAPIRO:  She's going to testify.

16          MR. COLEMAN:  And she's going to testify so --

17          THE COURT:  Okay.

18          MR. COLEMAN:  -- I don't there will be issues.

19          THE COURT:  Joe, if you see in that video any other

20 names that we need to worry about to make sure we don't have

21 any Bruton issues or, I guess, the only Bruton issue we'd have

22 would be with respect to Mr. Rowland and that will be all

23 redacted I'm sure, so okay.

24          MR. SCIOLLA:  I don't think there's any reference to

25 Mr. Rowland at all by Mr. Williams.

1          THE COURT:  Okay, great.  It makes it even easier.

2          MR. SCIOLLA:  Yeah, I think we're good.

3          THE COURT:  All right, good.

4          MR. COLEMAN:  But, I'll let the Court know if I see

5    any issues.

6          THE COURT:  Please, thank you.

7          MR. SHAPIRO:  I think we took it out.

8          UNIDENTIFIED SPEAKER:  Yeah.

9          MR. SHAPIRO:  And, so the Court knows.  We have

10   worked -- we have worked on a redacted version of that

11   statement that is, as the Court would say, mercifully shorter.

12   It's still not short, but it is shorter, and we've removed a

13   bunch of things that were potentially problematic, both Bruton

14   and otherwise.

15         THE COURT:  I appreciate that very much and obviously

16   if there are any issues -- I'm only sensitive to that because I

17   had a trial where we, man, we were on pins and needles trying

18   to navigate a similar issue and we successfully did, but it

19   wasn't without a lot of stress, worrying if a name was going to

20   get blurted, you know what I'm saying, so this is a lot

21   cleaner.  But, anyway, that's just why I raise it now.  The co-

22   conspirator statements under 801(d)(2)(E), that's all pretty

23   straightforward stuff.  Admissions of party opponents, and the

24   Almonte issue, use of notes and reports to cross examine, all

25   again very straightforward stuff.  If -- was there any -- were

1 there any anticipated legal issues in the Government's trial

2 memorandum that you would object to, have any problems with,

3 want to call to my attention?

4          MR. SCIOLLA:  Judge, I would not, but I did speak

5 with, well, Tim and Paul about this, there is significant

6 background information that's been provided by Mr. Banks

7 pertaining to Mr. Rowland --

8          THE COURT:  Okay.

9          MR. SCIOLLA:  -- that has nothing to do with this

10 conspiracy.  And, I'm advised -- they've advised me that

11 they've advised Mr. Banks to stay away from all of that, and I

12 just want the record to be clear that I completely concur with

13 them that none of that information which could be highly

14 prejudicial to Mr. Rowland is part of this trial or part of any

15 other conspiracy, so I know that there's reference --

16          THE COURT:  Give me an example of the nature of

17 something.

18          MR. SCIOLLA:  Well, Mr. Banks has related to the

19 Government that he believes that Mr. Rowland was involved in

20 other criminal activity, none of which is involved in this

21 case.

22          THE COURT:  Okay.

23          MR. SCIOLLA:  Specifically -- well, one allegation

24 is, is that there's a murder involved that supposedly Mr.

25 Rowland paid for, and I've been advised that Mr. Banks has been

1   admonished to not bring any of that information into the record

2   in this case.

3           THE COURT:  Knowing these guys, I'm sure the direct

4   examination questions will keep him out of those areas, you

5   know, and if you have any concerns and you maybe see a train

6   coming down the track that you want to ward off, I'll follow

7   your cue accordingly on that.

8           MR. SHAPIRO:  And, I had suggested to both counsel

9   that they remind me before Mr. Banks testifies to remind him

10  that --

11          THE COURT:  We'll all remind each other.

12          MR. SHAPIRO:  -- we have another -- but that we have

13  another session with him and I will instruct him, as I

14  typically do in these situations, that if he gets a question

15  from either side that he believes the truthful answer to which

16  calls for something which we've told him we're not talking

17  about, then he should just sit there and not answer the

18  question.

19          THE COURT:  Okay.

20          MR. SHAPIRO:  So that his silence will be a cue that

21  we need to convene at sidebar.

22          THE COURT:  Very good.  Okay.

23          MR. SCIOLLA:  And the only thing, Judge, is that we

24  did have a back and forth on this --

25          MR. COLEMAN:  Before we go into that, Guy, can I just

1 jump onto that last point real quick?

2          MR. SCIOLLA:  Yes, excuse me.  Yeah.

3          MR. COLEMAN:  Yeah, and it's part of Mr. Sciolla was

4 saying, Mr. Banks, at some point, had mentioned in one of his

5 proffer sessions that Mr. -- he had seen Mr. Williams on prior

6 occasions carrying a firearm.  Obviously, I said well that and

7 other drug related activity has nothing to do with this case,

8 so --

9          THE COURT:  Okay.

10          MR. COLEMAN:  -- that's part of the issue and of

11 course I'll talk to counsel before --

12          THE COURT:  Okay.

13          MR. COLEMAN:  -- Mr. Banks testifies, but that's --

14          THE COURT:  I appreciate that.  Okay.

15          MR. COLEMAN:  -- issue that --

16          THE COURT:  Yes, absolutely.

17          MR. COLEMAN:  Obviously I'm not going to step on any

18 of that so.

19          THE COURT:  Yes, okay.  I understand.  So, I

20 appreciate you highlighting the issue and we'll all just stay

21 on high alert and make sure.

22          MR. SHAPIRO:  And defense counsel obviously have to

23 be careful in their cross examination that --

24          MR. SHAPIRO:  Well, yeah, and certainly I'm not going

25 to ask Mr. Banks --

1          THE COURT:  Goes without saying.

2          MR. SHAPIRO:  -- has he ever seen Mr. Williams with a

3   firearm in his life.

4          THE COURT:  Yes.  Okay.

5          MR. SHAPIRO:  But I've had many trials where these --

6   I ask a completely unrelated questions and --

7          THE COURT:  And it comes out.

8          MR. SHAPIRO:  -- it's offered out of nowhere, well,

9   I've seen him with a gun many times.

10          THE COURT:  Look, hopefully we'll never get to that

11   point.

12          MR. SHAPIRO:  Right.

13          THE COURT:  If we do, we'll talk about the

14   appropriate construction, a motion to strike, appropriate

15   instruction to the jury, which you know we'll -- we'll

16   collaborate on and I'll make sure --

17          MR. SCIOLLA:  Yeah, hopefully that won't be

18   necessary.

19          THE COURT:  Certainly that's my hope as well.  Yes.

20          MR. SCIOLLA:  The other issue, Judge, that Mr.

21   Coleman and I would raise, as I said, we had some conversation

22   with Mr. Shapiro yesterday, Mr. Banks, at some point in the

23   past, as you all know probably, has a criminal record and a

24   conviction for drugs, but also was at some point an attempted

25   cooperator.  Apparently at a state level, he agreed some

1  portion of an agreement, that he would cooperate with the FBI.

2  At some point in time he's disconnected from that relationship

3  because he wasn't being either completely honest or completely

4  accurate or truthful about information the Government --

5          THE COURT:  With the state authorities?

6          MR. SCIOLLA:  With the FBI apparently because it was

7  with whom -- it was with the FBI that he had made the agreement

8  at the state level, and obviously as many times as you well

9  know, cooperating law enforcement agencies come together to get

10 information from any one individual that could be provided to

11 all agencies.  Our understanding from a very small squib of

12 information that was provided to us is that his continued

13 cooperation was terminated because he was not considered either

14 credible or complete.  And, we want to raise that at cross

15 examination and the Government may have an objection and I'd

16 like to sort of get that squared away today.

17         THE COURT:  All right.

18         MR. COLEMAN:  Judge, if I may just add a little more,

19 as well, and this is coming from the little bit of information

20 we received.  In particular in an affidavit on Page 5 it states

21 that it was in September of 2014 that Banks participated in a

22 non-custodial interview and agreed to talk with law

23 enforcement.  It doesn't indicate here but I believe the

24 Government had indicated to us that that was with a state

25 agency at the time, and he admitted into being involved in

1   trafficking cocaine.  After that, he was opened as a

2   confidential informant by the FBI.

3           THE COURT:  This goes back to 2014, Joe, did you say?

4           MR. COLEMAN:  2014, yes.  In December 2014 he was

5   closed as an informant because the agents, federal agents, were

6   concerned that he was not fully forthcoming and because he was

7   arrested for unrelated conduct while cooperating, so Mr.

8   Sciolla and I believe that that is relevant, not for just

9   propensity, for truthfulness, but for under 404 motive to

10  fabricate, specifically if Mr. Banks, in 2014, had made

11  attempts to cooperate withe federal government, with the FBI

12  and they closed him out like Mr. Sciolla said because either he

13  was not forthcoming or not credible, now when he is arrested in

14  2018 by the federal government, and he wants to cooperate

15  again, he has more -- he has motive to give as much information

16  as he can because he's already been deemed by that agency to be

17  not forthcoming, not credible, whatever it may be.  So, it's

18  our position, not to speak for Mr. Sciolla, but it is my

19  position and I believe it's his position, now Mr. Banks has

20  incentive to say what he knows, what he may not know, and to

21  fabricate, Judge, because he wants to give the Government every

22  single shred of things that he can, and even if he doesn't have

23  enough -- or enough information, he can make up certain things

24  to satisfy the Government that now he's not withholding

25  information like he was in the past.

1           THE COURT:  Well, so you're looking at really his

2   motive, as I understand, right --

3           MR. COLEMAN:  Motive to fabricate.

4           THE COURT:  -- as I understand it.  So, now the fact

5   that he was cut loose from his role as a cooperator four years

6   prior, you believe now gives him additional motive to spin as

7   many yarns as he can to save himself.  Why would that be

8   necessary?  Don't you already have the standard impeachment

9   with respect to his motive now to try to save himself?  I mean,

10  it's the same thing, right.  The argument is, you know, while

11  I'm sure it's going to be you're facing all this time, you have

12  every motive you know to make something up to save yourself,

13  why -- why do you need this for any extra motivation?

14          MR. COLEMAN:  Certainly he has that motive on, you

15  know, 5(k)(1), other motions being filed, cooperating and

16  letting his cooperation being known to the Government when

17  sentencing comes.  Of course there's motive for that.  I think

18  this is an additional layer of motive.  In addition, Your

19  Honor, this goes back to at the point that he's originally

20  arrested on the case, before he's had a chance to presumably

21  talk to this lawyer, before he's sat down in proffer sessions,

22  before the Government's promised to file motions based on his

23  cooperation, things that give that second layer of motive that

24  Your Honor is discussing, before all of that, he has this

25  motive to cooperate as much as possible and to fabricate

because he was previously not fully forthcoming with the
federal government.  Presumably, he could have said, listen, I
want to talk to you guys and they said, listen, man, we tried
to use you before, and you said, wait, wait, wait, I got all
this stuff for you.  And it's only at a later date, because we
know that the guilty plea, the change of plea, didn't happen
right away.  There was some time before that took place and
there was a number of proffer sessions that Mr. Banks
participated in.

THE COURT:  Understood.

MR. COLEMAN:  So, I don't think it's purely
cumulative, Your Honor.

MR. SCIOLLA:  I agree, Judge, if I may, and I echo
Mr. Coleman's comments in offering.  Excuse me.  My thing too
is that it's not a long inquiry that would be required here.
It would simply be that a jury should know this man has been
down this road before.  He's not an ingenue.  He knows that if
I cooperate I have to do x, y, and z, and he knows what he
didn't do, the last go around, and that disqualified him as a
cooperator.  So, in this situation, I think it's -- it's an
area of inquiry that the defendant should be permitted to
engage in to show a jury that this man might be doing this for
other motivations besides what the Court just touched upon,
which is obviously to get a much lesser sentence down the road.
So, like I said, I think the jury should know that this is not

1  the first time, you know, that this man has been to the

2  batter's box.

3           THE COURT:  Okay.  Paul?

4           MR. SHAPIRO:  If I may, your Honor, I'm going to

5  share with the Court the document that counsel were provided.

6           THE COURT:  Thank you.

7           MR. SHAPIRO:  And -- and for the record, this is a --

8  this is a not very heavily redacted copy of the documents from

9  the FBI's informant file.

10          MR. COLEMAN:  And that wasn't, just for the -- that

11  wasn't the only document I was referring to.

12          MR. SHAPIRO:  You --

13          MR. COLEMAN:  Also have Page 5 on the affidavit of

14  probably cause that I can hand up to Your Honor as well if

15  you'd like to see it?

16          THE COURT:  Sure.  Will the affiant be testifying?

17          MR. SHAPIRO:  He's on the list.  It's possible, but

18  --

19          THE COURT:  And, then okay.  And then let me -- I'll

20  look over, Mr. Shapiro, what you gave me.  Got it, okay.

21          MR. SHAPIRO:  So, the -- his CI file document is a

22  significant step in several respects.  First of all, the

23  document says that the FBI, one of the questions is was the

24  source closed for cause, and the answer is no.  So, that --

25  that makes the whole inquiry that much more tenuous.  But, the

1  most critical fact is, is that the CI was not notified of the

2  closing of his closure as a confidential informant.  So, the

3  suggestion by Mr. Sciolla that the witness knew that he had

4  been thrown out of the FBI, that he had been rejected for being

5  dishonest, just doesn't hold any water.  What this -- what this

6  document says is that the primary reason that they closed him

7  out was that he was no longer available to him.  They also

8  concluded that they had, not that he had lied to them, but that

9  he had not been as forthcoming as they would have wished.  But,

10  the document says that they -- that they didn't advise him of

11  that, which would of course make sense because he had

12  apparently been arrested and was not available to them.  So,

13  that --

14          THE COURT:  Does the defense have anything to

15  indicate that Mr. Banks knew why he was closed as an informant

16  in December of 2014?

17          MR. COLEMAN:  I do not, Your Honor, because I mean

18  the Government has not provided me with anything related to

19  that other than that the one document they just provided to

20  Your Honor, which that one document is at odds with the

21  document that I handed up to Your Honor --

22          THE COURT:  Not really.

23          MR. COLEMAN:  When the Government --

24          THE COURT:  Not really.  I mean, he wasn't closed for

25  cause, which could be a different reason then in Paragraph 12,

1  and in Paragraph 12, there's nothing to indicate that Banks was

2  told why he was closed as an informant.

3          MR. COLEMAN:  That --

4          MR. SCIOLLA:  Judge, I think it does.

5          THE COURT:  Where?

6          MR. SCIOLLA:  It says closing for cause, unauthorized

7  criminal activity.

8          THE COURT:  Where?

9          MR. SHAPIRO:  It says no.

10         THE COURT:  No.  The answer is no.

11         MR. COLEMAN:  Guy --

12         THE COURT:  The answer is no.

13         MR. SCIOLLA:  That --

14         MR. SHAPIRO:  That's an explanation of what the

15  definition of cause is.

16         THE COURT:  Yes.

17         MR. SHAPIRO:  It's a dictionary.

18         MR. COLEMAN:  Your Honor, what I --

19         MR. SCIOLLA:  Judge, it says right under that,

20  provide additional details.

21         THE COURT:  But, he was not closed for cause.

22  General reason --

23         MR. SCIOLLA:  Confidential --

24         THE COURT:  Hold on.  I can read it just as well as

25  you can.  No longer in position to report.

1          MR. SCIOLLA:  How about right under that?

2          THE COURT:  Closing for cause is based on the facts

3  -- that's an explanation of what closing for cause is.

4          MR. SCIOLLA:  No, under provide additional details.

5          THE COURT:  CHS has been arrested.  Those are

6  additional details.

7          MR. SCIOLLA:  Yeah.

8          THE COURT:  Would you recommend -- would you

9  recommend the CHS for reopening?  Yes.

10          MR. SCIOLLA:  Yeah, CHS has been arrested during

11  reporting time period and will likely be incarcerated for an

12  indefinite amount of time.  In addition, CHS was determined to

13  be withholding information that would benefit --

14          THE COURT:  Yes.

15          MR. SCIOLLA:  -- agents in ongoing investigation.

16          THE COURT:  Would you recommend the CHS for

17  reopening?  Yes.

18          MR. SCIOLLA:  Right.  Well then --

19          THE COURT:  Yes.

20          MR. SCIOLLA:  -- shouldn't that be something we be

21  allowed to -- to explore?

22          THE COURT:  No.  No.  I'll take more -- the key for

23  me is, this is important, but what's most important is there is

24  nothing that you can provide me that indicates that Mr. Banks

25  knew that in December of 2014 he was closed as an informant

1 because of concerns by government agents that he was not fully

2 forthcoming, because that undercuts all of the proffered

3 reasons for wanting to bring this to the jury's attention.  I

4 will take a further look at this.  Nothing I say today is

5 final.  But, at first blush, this seems to be an area that you

6 cannot get into with Mr. Banks.

7       MR. SCIOLLA:  Well, if I may respond, Judge, I don't

8 know how much of what we don't know is Brady material, because

9 this is all we've been given, and there may be a not sufficient

10 effort on the Government's part to disclose --

11       THE COURT:  I think there's -- well, (a) I know these

12 lawyers, (b) I know that they have made a sufficient effort,

13 (c) when they realized very close to trial one prior time that

14 they had inadvertently not turned something over, they with hat

15 in hand, came into court and begged for a continuance because

16 they had dropped the ball and needed to make right.  I have no

17 doubt that if there was anything like that, we wouldn't be here

18 ready to go to trial.

19       MR. SCIOLLA:  Judge, I'm not imputing either

20 gentlemen in any way at all.  I'm just simply saying that if

21 you don't ask those questions and that information doesn't

22 become available, we don't have any access to Mr. Banks --

23       THE COURT:  Here's -- but, here's the other thing,

24 Guy, the motive -- and, again, I don't -- this is all I want to

25 say on this today and I'll look at it more closely for you.  I

1 pledge to both of you to do that.  But, one, I think it's
2 cumulative.  You're going to have more than enough stuff to
3 beat him up on with respect to why he has a motive to tell the
4 Government what they want to hear.  You don't need this to do
5 that.  You say it's complimentary.  That's a good way of
6 putting it, but it's cumulative.  I don't think it adds much.
7 I mean, certainly, the fact that he committed other crimes or
8 that an agent thought he wasn't fully forthcoming is not nearly
9 as damaging to his credibility as probably anything else you're
10 going to drag out given his criminal history, his motive to lie
11 know, et cetera, so this isn't that important.  Two, there's
12 nothing that indicates that he knew about this, which is the
13 whole reason for why you want to bring it up.  And, you know,
14 three, I guess in descending order --
15          MR. SCIOLLA:  Well, if we were allowed to ask him.
16          THE COURT:  -- three, he wasn't closed out for cause
17 based on this form, so that's all I'll say about it today.
18 I'll look at it again and we can talk about it as we get
19 closer.
20          MR. SCIOLLA:  Okay.  Thanks, Your Honor.
21          THE COURT:  All right.  Thanks for bringing the issue
22 to my attention though.  I appreciate that.  Anything else that
23 the defense wanted to take up?
24          MR. SCIOLLA:  I don't think so, Judge.
25          MR. COLEMAN:  No, Your Honor.

1            THE COURT:  Okay.  That's all I had for today.  Were
2   there any other matters either side wanted to kick around?
3            MR. PALIVIDAS:  Your Honor, if I may just very
4   briefly?
5            THE COURT:  Yes.
6            MR. PALIVIDAS:  In terms of just setting technology
7   up so we have access to exhibits.  Would we have -- would we be
8   able to access to the Court before so that we can at some point
9   --
10           THE COURT:  Yes.  The Court will open -- I assume
11  we're going to be the first jury being selected on a Thursday.
12  That's one of the reasons I like to do it.  So, I assume we
13  will -- we will have the jurors up here by 9:45.  Fair
14  estimate.  It always takes -- you know when you're running late
15  for work and your clock in the kitchen says 7:30 and you walk
16  into your car and the clock in your car says 7:50, and you're
17  like, but I just left my kitchen?  It's kind of like that with
18  the jurors.  It's like they're ready --
19           MR. SCIOLLA:  You mean like my e-mail.
20           THE COURT:  Like your e-mail, but except this is
21  minutes, not months/years.  They just never seem to get up
22  here.  It's like, oh, they're ready and then we just sit
23  quarter to nine to closer to ten.
24           COURTROOM DEPUTY:  I'd say closer to ten.
25           THE COURT:  Jeff's already hedging and smartly.

1  Courtroom will be open by 8:30.

2          MR. PALIVIDAS:  Okay.

3          THE COURT:  You'll have access to the courtroom.  If

4  you have -- thanks for raising this issue.  If you have any

5  technology needs, you know, usually the high priced defense

6  lawyers just follow on the expert technology of the government

7  workers and that works very, very well.  I'm sure they'll be

8  very cooperative, as they always are.  If you guys have any

9  technology needs, please let us know.  I know you've done this

10 drill with us before.  And, if you have any separate technology

11 needs or requirements, please let us know and we'll work with

12 you to make sure you got it.

13         MR. PALIVIDAS:  Thank you, Your Honor.

14         THE COURT:  You're welcome.  And, then the courtroom

15 will be locked each night, so you can leave what you want to

16 leave here.  It's a -- it's not a bailment though.

17         MR. PALIVIDAS:  Okay.

18         THE COURT:  So, I'm not on the hook for anything that

19 disappears.

20         MR. PALIVIDAS:  I wouldn't dare, Judge.

21         THE COURT:  Mr. Lucini is.

22         MR. SCIOLLA:  It's assigned disclaimers.

23         THE COURT:  Yes.  Sir?

24         MR. SHAPIRO:  Your Honor, we had a -- we had a

25 discussion yesterday about Banks' criminal history, and having

54

1  had an opportunity to look at it over night, it seems to me

2  that his juvenile adjudications, which are 2006 and 2007,

3  should be out.  The remaining ones, the remaining convictions,

4  it seems to me, are appropriately fair game, but --

5           THE COURT:  Does defense have a different view on

6  that?

7           MR. COLEMAN:  I would just -- probably not, Your

8  Honor.  I would just have to review when he was released from

9  supervision on the juvenile cases, because presumably if the

10 release was within the ten-year date, then I might have an

11 argument.

12          THE COURT:  I -- that could -- I'm not sure that

13 applies to juvenile adjudications.

14          MR. SHAPIRO:  Juvenile adjudications have their own

15 rule.

16          THE COURT:  Yes.

17          MR. SHAPIRO:  They are presumptively excluded.

18          THE COURT:  Yes.

19          MR. SHAPIRO:  But, the Court still has discretion to

20 include them.  My point here is, not only are they juvenile

21 adjudications, but they're also quite aging.

22          THE COURT:  '06, '07.  Yes.

23          MR. COLEMAN:  I -- and I probably won't have an issue

24 with it, Your Honor.  I just would want to double check.  I

25 don't --

1          THE COURT:  That's fair.  Yes.

2          MR. COLEMAN:  There's plenty of adult convictions to

3    --

4          THE COURT:  Yes.  That goes back to my prior ruling.

5          MR. COLEMAN:  Yeah, I got you.

6          MR. SCIOLLA:  I simply want to say, Judge, that if

7    there was a continuing pattern of criminal or criminality on

8    Mr. Banks' part, then perhaps the juvenile stuff would come in,

9    but it appears that there's about a seven-year hiatus between

10   his first adult brush with his --

11         THE COURT:  Yes.

12         MR. SCIOLLA:  -- last juvenile, so I'm not going to

13   really argue that.

14         THE COURT:  I'll tell you, no one needs to file a

15   motion in limine on any of this stuff one way or the other.  At

16   first blush, it seems that Mr. Shapiro is probably correct with

17   respect to the juvenile adjudications.  Guy, if you were Joe,

18   take a different view on that, just please advise me and I'll

19   -- we'll decide the issue before trial.

20         MR. COLEMAN:  Yes, Your Honor.

21         MR. SHAPIRO:  The Government having conceded the

22   propriety of cross examination with the other ones though, it

23   does seem to me that under the rule they just simply get to

24   inquire about the fact of conviction, not the details and the

25   specifics of the crime, but just simply that he was convicted

1 of this crime on this date.

2          THE COURT:  That's the way it's always been presented

3 and I'm sure it will be -- yes, Guy, you're --

4          MR. SCIOLLA:  Yeah, I don't have a problem with that,

5 Judge.

6          THE COURT:  Yes.  Oh, could -- could you please

7 collaborate and prepare for me a one-pager, nothing more, of

8 the overview of the case that you would like me to read to the

9 jurors as part of jury selection?  I give them a 30,000 foot

10 level on the case.  I don't get into very much detail.  I

11 typically script something out myself.  I can do that.  In a

12 recent case the lawyers actually gave me one that they had

13 agreed upon and it made my life a lot easier.

14          MR. SCIOLLA:  We'll do that.

15          THE COURT:  Okay.  And, then -- yes, okay.  I

16 appreciate that, and it took me seven years to realize I can

17 actually ask the lawyers to do that and I don't have to sit

18 there and write it on my yellow pad.  I'm a slow learner, but I

19 get there.  Anything else.  Ms. Grasso, how are you?

20          MS. GRASSO:  Good morning, Your Honor.  First off, I

21 apologize.  I thought the hearing was at 11.

22          THE COURT:  That's okay.

23          MS. GRASSO:  I had it on my calendar for the wrong

24 day.  I just wanted to inquire as whether or not the Court

25 would like me just on standby?  I don't need to be present in

1  the courthouse for the --

2          THE COURT:  That's correct.

3          MS. GRASSO:  Okay.

4          THE COURT:  That's correct, and that's I think

5  consistent with how we left it the last time, right?  I'm

6  pretty sure.

7          MS. GRASSO:  I think so, but I wanted to make sure I

8  was here and asked for clarification about that.

9          THE COURT:  Yes.  Yes.

10         MS. GRASSO:  Absolutely.

11         THE COURT:  Have you -- and, Mr. Williams, you're

12 good with that?  That's -- yes, okay.  That goes back to that

13 conflict issue, okay.  You have the best standby lawyer in the

14 city, I can assure you.

15         MR. WILLIAMS:  Yes, sir.  Thank you.

16         THE COURT:  Okay.

17         MS. GRASSO:  Okay, great.  Thank you, Your Honor.

18         THE COURT:  Thank you, Ms. Grasso.

19         MS. GRASSO:  Absolutely.

20         THE COURT:  Yes.

21         MS. GRASSO:  Sorry for being late.

22         THE COURT:  No, no, no.  It's okay.

23                 (Court/clerk conversation)

24         THE COURT:  Defense counsel, if -- and I want to get

25 back to as one of the first thing we said, can you tell me now

1   that you won't have spectators for jury selection, because if

2   we are, we're going to have to do some leg work in advance of

3   Thursday?

4            MR. SCIOLLA:  No, no.

5            MR. COLEMAN:  None from us, Your Honor.

6            THE COURT:  Mr. Williams and Mr. Rowland, you good?

7            MR. ROWLAND:  I'm okay.

8            THE COURT:  Yes?

9            MR. ROWLAND:  Yes.

10           THE COURT:  Okay, good.  Mr. Williams?

11           MR. WILLIAMS:  Yes.

12           THE COURT:  Okay, thank you.  All right.  Thank you.

13   That saves us having to arrange for a separate courtroom

14   somewhere and audio and video equipment and all that.  Thank

15   you very much.  Anything else?  Jeff, anything else?

16           COURTROOM DEPUTY:  (No audible answer).

17           MR. SHAPIRO:  I knew I was going to forget and I

18   almost did.

19           THE COURT:  You know, Paul, it's a risk I take when I

20   say anything else here in the courtroom, so I'm used to it.

21           MR. SHAPIRO:  So there are notices of forfeiture in

22   the case.

23           THE COURT:  Yes.

24           MR. SHAPIRO:  And there are -- there are three ways I

25   guess that we can go about doing it.  We -- I mean, they're

1  entitled to a jury trial on the forfeiture issue so that we can

2  submit it to the jury, and we can file jury instructions for

3  that.  Sometimes defendants just simply choose to have the

4  Court decide the forfeiture issues after the primary issues in

5  the case are disposed of, and sometimes they just stipulate

6  contingent on --

7          THE COURT:  Plan C is usually the Court's favorite.

8          MR. SHAPIRO:  So --

9          THE COURT:  Have you had those discussions yet?

10          MR. SHAPIRO:  We have not.

11          THE COURT:  Okay.

12          UNIDENTIFIED SPEAKER:  No, Your Honor, we haven't.

13          THE COURT:  Keep me posted and we'll --

14          MR. SCIOLLA:  I'm sorry --

15          THE COURT:  Were we interrupting you?

16          MR. SCIOLLA:  No -- well, yeah, as a matter of fact

17  you were, but that's okay.

18          THE COURT:  All right.  The forfeiture issues.  We

19  were talking about the forfeiture issues.

20          MR. SCIOLLA:  Yeah, I agree with Paul.  You know,

21  eventually it's just going to be an issue that we can resolve,

22  but --

23          THE COURT:  All right.

24          MR. SCIOLLA:  -- I'm not looking for another jury

25  trial for forfeiture.

1        THE COURT:  Okay.

2        MR. COLEMAN:  That's where I'm at, too, Judge.  I

3  think we just need to hammer it out, but I'm --

4        THE COURT:  Got it.  Thank you very much for raising

5  that.

6        MR. SCIOLLA:  That's fine.  Just don't interrupt me

7  again while I'm talking.

8                    (Laughter)

9        THE COURT:  I promise.  Do I have appeal rights too?

10                    (Laughter)

11       MR. SCIOLLA:  Very few.

12       THE COURT:  Yes.  Anything else from anybody?  All

13  right.  Thanks, everybody.

14       UNIDENTIFIED SPEAKER:  Thank you, Judge.

15       THE COURT:  It's nice to see you all again and I'm

16  happy that we'll finally be able to get our trial, have our

17  trial, and let the jury decide.  So, if you have any other

18  issues, problems, questions, comments, for any of us, please,

19  as you always do and are good about doing, contact Jeff.  I'll

20  look for Mr. Stengel's supplements or changes or -- to the jury

21  instructions.  We'll implement those.  We'll turn a draft back

22  around to you next week to all counsel and -- great.  Thanks

23  for everything.  Thanks for all your hard work and your

24  cooperation on the case.

25       MR. COLEMAN:  Thank you, Judge.

1          MR. SCIOLLA:  Thank you, Judge.

2          THE COURT:  Yes, sir.

3          MR. SHAPIRO:  Thank you, Your Honor.

4          MR. STENGEL:  Thank you, Your Honor.

5                          *  *  *  *  *

6

7                 **C E R T I F I C A T I O N**

8          I, WENDY ANTOSIEWICZ, court approved transcriber,

9  certifies that the foregoing is a correct transcript from the

10  official electronic sound recording of the proceedings in the

11  above-entitled matter, and to the best of my ability.

12

13

14  /s/ Wendy Antosiwicz

15  WENDY ANTOSIEWICZ

16  J&J COURT TRANSCRIBERS, INC.         DATE: December 9, 2022

17

18

19

20

21

22

23

24

25